IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


EDUVIJES V. CHAVEZ,

           **Plaintiff,**

vs.                                        **No. CIV 08-0087 MV/WDS**

**LONG TERM DISABILITY INCOME
PLAN FOR CHOICES ELIGIBLE
EMPLOYEES OF JOHNSON &
JOHNSON AND AFFILIATED
COMPANIES,**

           **Defendant.**


<u>**MEMORANDUM OPINION AND ORDER**</u>

      **THIS MATTER** is before the Court on (1) Plaintiff's Opening Brief to Overturn

Administrator's Decision **[Doc. No. 32]**, filed on August 25, 2008; (2) Plaintiff's Motion to

Supplement the Record and Supporting Memorandum **[Doc. No. 33]**, filed on August 25, 2008;

and Defendant's Motion and Memorandum in Support of Judgment on the ERISA

Administrative Record **[Doc. No. 34]**, filed on August 25, 2008.

      This is a case arising under the Employee Retirement Income Security Act of 1974, 29

U.S.C. §§1001-1461("ERISA").  Plaintiff contends Defendant's decision to terminate her long

term disability benefits was arbitrary and capricious and not supported by substantial evidence.

Plaintiff requests the Court overturn the administrator's decision to terminate her long term

disability benefits and enter a judgment in her favor.  Because the Court finds that the

administrator's denial of benefits was arbitrary and capricious and not supported by substantial

evidence, Plaintiff's request to overturn the administrator's decision is **GRANTED**.  However,

Plaintiff's Motion to Supplement the Record and Supporting Memorandum is not well taken and

will be **DENIED**, and Defendant's Motion and Memorandum in Support of Judgment on the

ERISA Administrative Record is not well taken and will be **DENIED.**

## I.  Background

Johnson & Johnson employed Plaintiff from May 8, 1989, until she became disabled in

1997.  Administrative Record ("AR") 0038.  Plaintiff received long term disability benefits

under Johnson & Johnson's Long Term Disability Plan ("the Plan") from April 28, 1997, until

April 18, 2006.  AR 0039, 0041.  Initially, Plaintiff's claim was "opened for the following

diagnoses: Bilateral Osteoarthritis, HPN (herniated nucleus pulposus) at C6-C7, Fibromyalgia[1]

---

[1] Fibromyalgia is a common nonarticular disorder of unknown cause characterized by generalized aching (sometimes severe), widespread tenderness of muscles, areas around tendon insertions, and adjacent soft tissues, as well as muscle stiffness, fatigue and poor sleep. Diagnosis is clinical.  In fibromyalgia, any fibromuscular tissues may be involved, especially those of the occiput, neck, shoulders, thorax, low back, and thighs.  There is no specific histologic abnormality.  Symptoms and signs are generalized.  Fibromyalgia may be precipitated by a viral or other systemic infection (eg, Lyme disease) or a traumatic event.

Stiffness and pain frequently begin gradually and diffusely and have an achy quality. Symptoms can be exacerbated by environmental or emotional stress, poor sleep, trauma, or exposure to dampness or cold or by a physician who implies that the disorder is "all in the head." Patients tend to be stressed, tense, anxious, fatigued, ambitious, and sometimes depressed. Many patients also have irritable bowel syndrome symptoms or migraine or tension headaches. Pain may worsen with fatigue, muscle strain, or overuse. Specific, discrete areas of muscle (tender points) may be tender when palpated.

Fibromyalgia is clinically diagnosed.  Patients usually have generalized pain and tenderness, disproportionate to physical findings, fatigue as the predominant symptom, and negative laboratory results despite widespread symptoms.  Tests should include ESR or C-reactive protein, CK, and probably tests for hypothyroidism and hepatitis C (which can cause fatigue and generalized myalgias). The diagnosis is based on clinical criteria, including tenderness at some of the 18 specified tender points.  Most experts no longer require a specific number of tender points to make the diagnosis, as originally proposed (at least 11 of 18). Patients with only some of the specified features may still have fibromyalgia.

Treatment may include medications to decrease depression, muscle relaxants, tricyclic antidepressants or cyclobenzaprine to improve sleep, nonopioid analgesics (e.g. tramadol,

and Polyarthralgia."  AR 0032.  In 2000, Plaintiff was diagnosed with fibromyalgia syndrome,

osteoarthritis, degenerative disc disease of the lumbar spine, herniated discs of the cervical spine,

depression and anxiety.  AR 0039.

## A.  The Plan

Under the Plan, "total disability" is defined as "the complete inability of the Participant,

due to Sickness or Injury, to do **any job** for which the Participant is (or may reasonably

become), with or without reasonable accommodation, qualified by training, education, or

experience."  AR 0008.  The Plan also requires "a plan of treatment for the Participant's

Sickness or Injury which is prescribed by an Approved Treatment Provider and which: (a)

conforms to generally accepted medical practice for treating the Sickness or injury; (b) is

consistent with the stated severity of the Participant's medical condition; and (c) includes the

regular care of an Approved Treatment Provider."  AR 0004.  Moreover, the Plan requires the

Participant to see a "Provider whose speciality or expertise is the most appropriate for the

Sickness or Injury, and any disability that results therefrom, according to generally accepted

---

acetaminophen and nonsteroidal anti-inflammatory drugs).  Trigger injections are used to treat
incapacitating areas of focal tenderness.  In severe cases, Patients are referred to pain
management programs.

Stretching exercises, aerobic exercises, sufficient sound sleep, local applications of heat,
and gentle massage may provide relief. Overall stress management (eg, deep breathing exercises,
meditation, psychologic support, counseling if necessary) is important.

Fibromyalgia tends to be chronic but may remit spontaneously if stress decreases. It can
also recur at frequent intervals.

*See* http://www.merck.com/mmpe/sec04/ch040/ch040d.html#fg040_1 (emphasis added).

medical standards and, in any event, shall be a behavioral health specialist for any behavioral health condition."  AR 0005.

The Plan requires that if a claim "has been denied . . . the Claims Service Organization will issue a written notice to the Participant . . . ."  AR 0012.  The written notice "shall contain specific reasons for the denial . . . and specific references to the pertinent Plan provisions on which the denial or limitation of benefits is based."  *Id.*  Additionally, "the notice shall contain a description of any additional material or information necessary for the Participant to submit for reconsideration of the claim and an explanation of why such material or information is necessary."  *Id.*  Finally, "[a]ny review of a denied claim by the Claims Service Organization or the Pension Committee or its delegates, as the case may be, shall take into account all comments, documents, records and other information submitted relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination."  AR 0014.

**B.  Procedural History**

As previously noted, Plaintiff received benefits under the Plan from April 28, 1997, through April 18, 2006.  Broadspire Services, acting as a third party claims administrator for the Plan, began the process of reviewing Plaintiff's claim under the "any occupation" definition.[2]

---

[2] The Plan defines "any occupation" as

(B) During the remainder, if any, of the period of disability, the complete inability of the Participant, due to Sickness or Injury, to perform the Essential Functions of any Gainful Occupation that his or her training, education, or experience would allow the Participant to perform, or for which the Participant may reasonably become qualified with or without reasonable accommodation.

AR 0165.

AR 0165.  On February 17, 2006, Broadspire sent Plaintiff a letter informing her that based on

the January 18, 2006 Independent Medical Examination (IME), it was  terminating her long term

disability benefits, effective April 18, 2006.  *Id.*  Specifically, Broadspire informed Plaintiff that

Dr. Santos had concluded she was capable of working a sedentary job at 8 hours a day.

Broadspire also informed Plaintiff she could "file a written request for a review of [her] claim."

*Id.*  Broadspire directed Plaintiff to "provide [Broadspire] with current medical documentation

that includes objective data, such as, but not limited to the following: Functional Capacity

Evaluations; Physical therapy notes, office notes, consultation notes, progress reports; (2)

Current x-rays, CT/MRI Scan and laboratory results to support your diagnosis and claims for

disability."  *Id.*  However, Broadspire did not include "an explanation of why such material or

information [was] necessary" to her appeal.

James Santos, M.D., performed the January 18, 2006 IME.  Dr. Santos opined Plaintiff

was capable of working a sedentary job at 8 hours a day.  *Id.*  Dr. Santos's opinion was "strictly

based on [Plaintiff's] physical exam and record review."  AR 0156.  In performing the IME, Dr.

Santos reviewed the following: (1) Dr. Hochstadt's medical notes from 2004, (2) the Report of

Neuropsychological Consultation submitted by Rex Swanda, a psychologist, and (3) an April 2,

2004 brain MRI, which was normal.

Dr. Santos reviewed Dr. Swanda's report.  In his report, Dr. Swanda made clear that "the

restrictions for [Plaintiff's] ability to work . . . would be best judged by her medical providers

who treat her pain."  AR 0163.  Dr. Swanda's findings also indicated "variable attention."

According to Dr. Swanda, "[t]his pattern of variable attention suggests that internal

distractibility, whether due to internal 'chatter,' pain, or even medication effects, is likely to undermine attention." AR 0161.  Dr. Swanda also noted, "she does at least <u>occasionally</u> demonstrate ability to direct her full attention resources to the task at hand." *Id.* (emphasis added).

On March 25, 2006, Plaintiff appealed the termination of her long term disability benefits.  AR 0167.  Plaintiff sent a short hand-written note informing Broadspire that "Dr. Santos could not possibly determine weather (sic) I could work an eight hour day or not.  His examination lasted maybe 20 minutes." *Id.*

On May 10, 2006, the Reed Group, now the third party disability claims administrator for the Plan (AR 0200), wrote a letter to Plaintiff acknowledging it had received Plaintiff's March 25, 2006 letter, which it construed as an appeal.  In this letter, the Reed Group stated:

> As stated in the denial letter, additional supporting medical information is necessary to determine whether or not you qualify for Long Term Disability benefits.  In all instances, it is the claimant's responsibility to furnish this information.  Unfortunately, no additional information was enclosed with your appeal.
>
> Please forward to our attention, any pertinent medical information to support your claim for disability.  Our office must receive this information by **05/20/2006** in order to consider it as a part of your appeal.

AR 0164.

In a letter dated "5/2006," Plaintiff informed the Reed Group of her concern with Dr. Santos's evaluation.  AR 0169.  Plaintiff stressed she was still disabled and noted her multiple conditions.  *Id.* Plaintiff also informed the Reed Group she had been trying to contact Dr. Hochstadt.  *Id.*

On May 21, 2006, Dr. Hochstadt, an internist and Plaintiff's primary health care provider, sent the Reed Group a letter, stating: "Ms. Vickie Chavez was last seen by me on

6

3/17/06 for management of chronic headache and neck pain.  She was advised to be seen in our

pain management clinic, neurology clinic & rheumatology clinic."  AR 0173.

On May 24, 2006, the Reed Group sent Plaintiff a letter informing her that "[b]ased upon

the review of the submitted medical documentation, we have determined the documentation does

not substantiate your disability as defined by the Johnson & Johnson LTD Plan."  AR 0170.  The

letter included a list of what documents the Reed Group reviewed.  This consisted of Dr.

Santos's January 18, 2006 IME, Dr. Swanda's June 17, 2005 Neuropsychological Consultation

Report, and Dr. Hochstadt's May 21, 2006 letter.  The Reed Group informed Plaintiff she could

further appeal by submitting a written request for appeal with any additional medical documents

within sixty (60) days from May 24, 2006.  The Reed Group mandated the additional medical

documents "be submitted for review at one time" and "no later **than 7/23/06**."  AR 0171.

On July 21, 2006, Plaintiff faxed a statement to the Reed Group, stating, "Appeal Long

Term Disability" and included additional medical records.  AR 0179 to 0187.   These records

included the following: (1) Dr. Hochstadt's referral for physical therapy for her shoulder dated

**July 14, 2006** (AR 0180); (2) notes from Dr. Hochstadt's office indicating Plaintiff had called

his office regarding her pain and informed the licensed practical nurse Plaintiff had last seen Dr.

Hochstadt on **July 14, 2006,** and had an appointment with the pain clinic on **August 8, 2006** (AR

0181); (3) Dr. Hochstadt's medical notes (AR 0182); (4) Dr. Kumar's medical notes (AR

01830); and (5) Dr. Pagan's medical notes (AR 0184–0187).

Dr. Hochstadt medical records indicate Plaintiff had seen Dr. Kumar in Rheumatology

and Dr. Pagan in Neurology.  Dr. Hochstadt noted Plaintiff had fibromyalgia, rebound headaches

related to analgesic abuse as well as chronic underlying headache.  AR 0182.  Additionally, Dr.

Hochstadt noted Plaintiff "continues having problems with anxiety and depression." *Id.* Dr. Hochstadt assessed Plaintiff with shoulder pain, neck pain, analgesic abuse, chronic headache and depression. Dr. Hochstadt started Plaintiff on amitriptyline 10 mg at bedtime, increasing by 10 mg every 5 nights to a total of 40 mg. Dr. Hochstadt also referred Plaintiff to physical therapy and "to the Pain Management Clinic for any additional types of help in terms of her fibromyalgia and particularly for trigger point injection." *Id.* Dr. Hochstadt directed Plaintiff to return for a follow up in 6 weeks.

Dr. Kumar's medical notes are incomplete. Dr. Kumar noted Plaintiff's current medications were Ibuprofen 600 mg 2-3 times a day, nortriptyline 10 mg 2 tablets every day at bedtime, Baclofen 10 mg as needed, Tylenol #3 as needed, Flexeril 10 mg every day at bedtime and Paxil 30 mg once a day. AR 0183. Dr. Kumar noted Plaintiff had a history of arthralgias, myalgias, malaise and fatigue. Dr. Kumar performed a physical examination and found Plaintiff's range of motion in her shoulders, elbows, wrists, knees, ankles, and hips to be within normal limits. No instability was noted. Dr. Kumar performed a neurological examination which demonstrated normal motor strength, sensory examination and deep tendon reflexes. Dr. Kumar noted Plaintiff had "multiple tender points throughout her body" and "decreased range of motion in her cervical spine as well as paraspinal muscle spasm." AR 0183. Plaintiff also had mid foot collapse and mild hammertoes. Dr. Kumar diagnosed Plaintiff with fibromyalgia and noted:

> This is a 45-year-old pleasant female with the history of arthralgias, myalgias, malaise, and fatigue. **She does have multiple tender points as well as nonrestorative sleep pattern consistent with fibromyalgia/myofascial pain syndrome**. She also has history of degenerative disk disease in her cervical spine. I understand her MRI was done in 1997. **She has myofascial pain syndrome and occipital headaches because of the degenerative cervical spine**. She also has a

history of migraines as well.  She has history of chronic neck pain as well as lower back pain and has depression.

We discussed various options available in managing her chronic pain, obviously muscle relaxants, anti-depressants, nonnarcotic painkillers like Neurontin, tramadol are options in controlling her pain.  We did discuss treating her sleep issues, nonrestorative sleep pattern can certainly worsen her chronic pain problems. Narcotics might worsen her sleep disorder.

We also discussed a low-impact water aerobic exercise programs, sleep, hygiene, balanced diet, etc.

**I informed the patient that as a specialist, I make [a] diagnosis of fibromyalgia**. Often diagnosis of fibroymyalgia is made by **ruling out other inflammatory conditions**.  **At present I do not see any evidence of inflammatory arthritis on examination**.

AR 0183 (emphasis added).  Dr. Kumar advised Plaintiff to continue her follow up care with Dr. Hochstadt and, if needed, by the pain clinic.  Dr. Kumar's notes abruptly end with a referral to an additional physician.  However, the name of the referral physician is missing.

Dr. Pagdan, a neurologist, evaluated Plaintiff on June 20, 2006.  AR 0185– 0187.  The neurological examination was essentially normal.  AR 0186.  The musculoskeletal examination was essentially normal except for "very tight and tender cervical and trapezius muscles" and "some lumpy tender nodules on bilateral trapezius muscles."  *Id.*  Dr. Pagdan noted, in part:

This 45-year-old female started with neck pain with apparently a diagnosis of herniated disc.  In fact, I reviewed the MRI performed in 1997, and it did **show a disc protrusion at C6-C7**.  **In my opinion, this probably triggered myofascial pain syndrome in her neck and shoulders, which in turn started to produce secondary muscle contractions or muscle tension type of headache**.  Over the years, this was the type of headache that this patient was having.  Occasionally, there appears to be some migrainous features such as nausea and come light sensitivity, but basically, her underlying headache is tension-type headache or related to the **myofascial pain syndrome in her neck**.  However, over the past year or so, she had been taking quite a bit of Tylenol, Tylenol No. 3, and ibuprofen, and in fact, up to 12 tablets of Tylenol per day.  It is therefore, not surprising that she now has

9

probably medication overuse headache. Her current headache is due to this medication overuse.

AR 0186 (emphasis added). Dr. Pagdan recommended Plaintiff discontinue Tylenol, Tylenol No.3 and Ibuprofen and, instead, start amitriptyline at 10 mg at bedtime, gradually increasing the dosage to one that would be effective and as tolerated. AR 0185. Dr. Pagdan opined this dosage could be anywhere from 70 to 100 mg at bedtime. *Id.* Because Dr. Pagdan was leaving Lovelace, he recommended Dr. Cary Suter, a specialist in headache treatment, in case Dr. Hochstadt needed further assistance from Neurology. *Id.*

On July 25, 2006, the Reed Group sent Plaintiff a letter confirming receipt of her July 21, 2006 request for appeal. AR 0178. The letter also informed Plaintiff that the Reed Group would notify her in writing of the decision within forty-five (45) days of her request. *Id.*

On August 8, 2006, the Reed Group requested a forty-five (45) day extension in order to continue its review of Plaintiff's appeal file. AR 0197. The Reed Group also indicated it would render a decision no later than October 18, 2006.

On September 14, 2006, the Reed Group sent "the final level appeal summary" on Plaintiff's claim to the Johnson & Johnson Benefit Claim Committee. AR 0037-0043. Along with the summary, the Reed Group included five (5) attachments (essentially the administrative record). The final level appeal summary listed the following rationale for denying benefits:

**Reason: (Denial Rationale)**

The denial will be upheld based on the following favorable IMEs and FCE:

> IME from physiatrist dated 1/18/06 which indicated the claimant could safely work at a sedentary work status for an eight-hour period. Her limitations would likely be more based on perceived pain with an underlying psychological component.

10

> IME from neuropsychologist of 6/17/05 which indicated normal findings in cognitive functioning with no interference with most types of routine workplace responsibilities.
>
> Comprehensive **Functional Capacity Evaluation of 4/21/97** which demonstrated the claimant's ability to work within the light physical demand. She was functional to lift, move, and carry 11 to 20 pounds occasionally, 10 pounds frequently, and a negligible amount constantly.

AR 0038 (emphasis added).

On October 18, 2006, the Reed Group sent Plaintiff a letter informing her "Corporate Benefits has determined that the existing documentation does not clinically support your appeal of the original denial of your claim." AR 0035-0036. This was the final and binding decision.

## II.  Standard of Review

"ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113, 109 S.Ct. 948, 956 (1989)(internal citations and quotations omitted). "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. at 956-57. "[I]n respect to discretionary claims processing," [ERISA] "underscores the particular importance of accurate claims processing by insisting that administrators provide a full and fair review of claim denial." *Metropolitan Life Ins. Co. v. Glenn*, – U.S.– , 128 S.Ct. 2343, 2350 2008)(internal citations omitted).

In this case, there is no dispute that the Plan provides the administrator with discretionary authority to determine eligibility for benefits and construe the terms of the Plan. *See* AR 0026, (10). Thus, the de novo standard of review is not applicable, and the Court must apply the

11

"arbitrary and capricious" standard of review.[3]   *Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997, 1003 (10th Cir.2004).  The Court's review "is limited to determining whether [the plan administrator's] interpretation was reasonable and made in good faith."  *Id.* (quoting *Hickman v. GEM Ins. Co.*, 299 F.3d 1208, 1213 (10th Cir. 2002).  In applying the arbitrary and capricious standard, the decision will be upheld so long as it is predicated on a reasoned basis.  *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir.1999).  Additionally, "in reviewing a plan administrator's decision under the arbitrary and capricious standard, the federal courts are limited to the administrative record– the materials compiled by the administrator in the course of making his decision."  *Id.* (Internal quotations omitted).  Under this standard, the Court must deny Plaintiff's Motion to Supplement the Record (Doc. No. 33).  *See also Hall v. UNUM Life Insurance Co. Of America*, 300 F.3d 1197, 1201 (10th Cir. 2002).

Finally, "the possibility of an administrator operating under a conflict of interest," changes the analysis.  *Fought*, 379 F.3d at 1003.  "[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion."  *Id.*  In this case, Plaintiff asserts "[n]o Johnson & Johnson funds are contributed to the trust that pays long term disability benefits" and thus "there is no apparent conflict of interest having Johnson & Johnson employees make the benefit decision."  Pl.'s Opening Br. at  pg. 2.  Nonetheless, relying on *Fought,* Plaintiff contends the Court should apply a less deferential standard of review due to serious procedural irregularities.

---

[3] The Tenth Circuit treats the terms "arbitrary and capricious" and "abuse of discretion" as interchangeable in this context.  *Fought*, 379 F.3d at 1003 n2.

In *Fought*, the Court of Appeals for the Tenth Circuit set forth the standard a court must apply when "a serious procedural irregularity exists," noting:

> [W]hen a serious procedural irregularity exists, and the plan administrator has denied coverage, an additional reduction in deference is appropriate. Under this less deferential standard, the plan administrator bears the burden of proving the reasonableness of its decision pursuant to this court's traditional arbitrary and capricious standard. In such instances, the plan administrator must demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence. The district court must take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict.

*Fought*, 379 F.3d at 1006 (internal citations omitted). "Thus, when . . . a serious procedural irregularity exists, . . . and the plan administrator has denied coverage, the district court is required to slide along the [sliding] scale considerably and an additional reduction in deference is appropriate." *Id.* at 1007.

### III.  Discussion

Plaintiff contends the February 17, 2006 letter from Broadspire did not comply with the requirements of the DOL regulations or the Plan because it did not tell her why it needed the additional documentation. Plaintiff also contends the May 24, 2006 letter from the Reed Group did not comply with the Plan's Claim Appeal Procedure when it required that Plaintiff submit her additional medical documents "for review at one time." AR 0171. Second, Plaintiff contends she was not told that the third party administrator did not have all of her records. Third, Plaintiff contends she was never informed of the need or importance of a functional capacity examination. Finally, Plaintiff contends the Reed Group relied upon a 1997 functional capacity examination to deny her benefits.

Plaintiff alleges the Plan violated ERISA by failing to provide adequate written notice and explanation of the denial of benefits. The relevant ERISA provision, § 1133, provides:

13

In accordance with regulations of the Secretary, every employee benefit plan shall–

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. §1133.  The relevant portions of the regulation implementing this statutory provision

require that a plan administrator set forth:

(i) The specific reason or reasons for the adverse determination;

(ii) Reference to the specific plan provisions on which the determination is based;

(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;

(v) In the case of an adverse benefit determination by a group health plan or a plan providing disability benefits ... [i]f an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request ....

29 C.F.R. §2560.503-1(g)(1).  "Substantial compliance with the requirements of §1133 is

sufficient."  *Hickman v. GEM Ins. Co.*, 299 F.3d 1208, 1215 (10th Cir.2002)

The Plan contends it substantially complied with applicable procedural requirements

when the third party administrator explained to Plaintiff the time limit for appealing, where she

14

needed to send her appeal and the kinds of information Plaintiff should submit to support her

appeal.  Def.'s Resp. at 4.  However, the Plan makes clear and mandates that when benefits are

denied, "the notice **shall** contain a description of any additional material or information

necessary for the Participant to submit for reconsideration of the claim **and** an explanation of

why such material or information is necessary."   AR 0012.  The administrator failed to explain

to Plaintiff why additional materials were necessary to her appeal.  An explanation of why

Plaintiff needed to submit additional medical documentation might have alerted Plaintiff to the

fact that the third party administrator had lost her medical records from 1998 to 2004, and

allowed Plaintiff to resubmit her records and seek the necessary medical evaluations, i.e., a

functional capacity evaluation.

The Plan concedes the Reed Group "did not obtain from the prior third party

administrator all the medical records from 1998 to 2004."  Def.'s Resp. at 5.  However, the Plan

contends "medical records from 1997 through 2004 were not relevant; they did not address the

issue before the Committee."  *Id.*  The Plan maintains these records were not pertinent to the

issue of whether Plaintiff qualified for long term disability benefits in April 2006.  Additionally,

the Plan argues that, if Plaintiff believed the missing records "supported her claim of disability,

she should have submitted them any time from February 17, 2006, when she first learned her

claim was being denied until October 18, 2006."  *Id.* at 6.  However, the Reed Group did not

discover these records were missing until May 24, 2006.  AR 0277.  Moreover, on March 25,

2006, Plaintiff signed an "Authorization to Disclose Medical Information" form which the Reed

Group had in its file.  AR 0199.  The Reed Group could have requested the lost medical records

from Plaintiff's health care providers.  More importantly, the Plan does not dispute Plaintiff's

assertion that she was never notified that her records from 1998 to 2004 were lost.  Therefore, the Plan cannot hold Plaintiff responsible for not resubmitting her records from 1998 to 2004 if she was not aware those records had been lost.

Furthermore, the Plan requires that "any review of a denied claim by Claims Service Organization or the Pension Committee or its delegate, as the case may be, shall take into account all comments, documents, records and other information submitted relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination."  AR 0014.  Thus, the Plan **mandates** the review include all documents and records, including those considered in the initial benefit determination.  It is perplexing to the Court how a 1997 FCE would be relevant and form the basis for denying Plaintiff disability benefits in 2006, yet records from 1998 to 2004 would not be relevant in determining whether Plaintiff's disability was ongoing.  *See* AR 0038.  Fibromyalgia tends to be a chronic disorder and requires comprehensive treatment.  Medical records from 1998 to 2004 are certainly relevant to the issue of whether Plaintiff was still disabled in 2006.

In the Reed Group's October 18, 2006 letter to Plaintiff and the final, binding decision to deny benefits, it noted:

Corporate Benefits findings are:

Trigger Points which are an indication of Fibromyalgia, a disease of "exclusion," were listed only once in your record by Dr. Comer for the SSA application in 1998. She recorded 8/10 points.  No in-depth examination or tests to exclude other diseases were included in your file.

The only finding in the IME by Dr. Santos was a mildly restricted ROM on extension of the cervical spine, which would not preclude you from performing sedentary work for 8 hours.

The IME performed by Dr. Swanda found moderate levels of depression which may interfere to a mild degree in terms of working. He found no cognitive, reality, emotional dyscontrol or significant behavioral impairments that would preclude you from working.

None of the documents received from your providers during your appeal state you cannot work, nor do they refute the findings on the two IME's, which were confirmed by your own providers.

The examination notes of Drs. Hochstadt and Pagdan submitted on final appeal found only "somewhat decreased ROM of the cervical spine" and "rebound headaches due to analgesic abuse," respectively. All other results were within normal limits. Neither of these findings would preclude you from performing at a sedentary level demand job for 8 hours per day.

Your diagnosis of Depressive Disorder was not part of the appeal decision as there is no documentation in your record that you had ever-sough help from a "behavioral health specialist" as required by the Plan.

AR 0036. In the same letter, under "Final Appeal" (p. 4), the Reed Group included the following

medical report it relied on to deny Plaintiff disability benefits.

Note dated 7/20/06 from Barry Hochstadt, MD, Internal Medicine: diagnoses are FM (fibromyalgia), Pain Syndrome, Osteoarthritis, DDD (degenerative disk disease), Migraines and headaches and joint pains throughout body; had mid foot collapse and mild hammertoes; normal gait, somewhat decreased ROM of Cervical Spine. Liver Function Tests done on 3/17/06 wnl (within normal limits). No evidence of inflammatory arthritis. Brain MRI in April 2004 wnl. Headaches are due to medication overuse and are tension type.

AR 0035. The Reed Group mistakenly attributed Dr. Kumar's examination and medical notes to

Dr. Hochstadt. Dr. Kumer noted, "Unfortunately I do not have anything else to offer this patient.

She was advised to continue her follow up care with her primary care provider." AR 0183. Dr.

Hochstadt is Plaintiff's primary care provider, so these medical notes cannot be Dr. Hochstadt's

medical notes.

Dr. Kumer, a Rheumatologist, diagnosed Plaintiff with fibromyalgia. AR 0183. Dr.

Kumar was clear that the diagnosis of fibromyalgia is often made by ruling out other

inflammatory conditions.  *Id*.  Dr. Kumer noted Plaintiff's Laboratory Data, "On 03/17/2006,

LFTs (liver function tests) were within normal limits.  On 01/04/2006, TSH seemed to [be]

slightly decreased.  ESR was normal.  CBC and CMP were normal."  *Id.*  Because these tests

were normal and there was no evidence of inflammatory arthritis on examination, she diagnosed

Plaintiff with fibromyalgia.  *Id.*  On examination, Dr. Kumar also found "multiple tender points

as well as nonrestorative sleep pattern consistent with fibromyalgia/myofascial pain syndrome."

*Id.*  Accordingly, the Reed Group's findings that (1) trigger points were only listed in 1998 and

(2) no in-depth examination or tests to exclude other disease were included in Plaintiff's file are

not supported by the evidence.

The Reed Group also failed to consider Dr. Swanda's statement regarding Plaintiff's

"pattern of variable attention" which was "likely to undermine attention."  AR 0161.  Dr.

Swanda noted Plaintiff  "at least **occasionally** demonstrate[d] ability to direct her full attention

resources to the task at hand." *Id.*  This limitation in concentration was significant such that Dr.

Swanda chose not to make a judgment as to Plaintiff's ability to work, leaving that to her

medical providers.

Additionally, the IMEs performed by Drs. Santos and Swanda were based on incomplete

information.  Dr. Santos reviewed Dr. Hochstadt's 2004 medical records, Dr. Swanda's

consultative evaluation, and the 2004 MRI.  AR 0149.  Dr. Swanda reviewed "a summary

medical records that was compiled in the form of a peer review."  AR 0157.  Neither physician

had Plaintiff's complete medical records.

The Plan defends its decision to choose an IME over a FCE on the basis of cost and the

difficulty of locating a physical therapist to perform the FCE.  Additionally, the Plan claims it

considered "the desirability of having a specialist in physical medicine and rehabilitation actually meet with [Plaintiff] and personally examine her." Def.'s Resp. At 6-7. The Court does not question the Plan's decision to choose an IME over a FCE. However, it is a serious concern to the Court that the Plan failed to provide its independent medical expert with all of the relevant evidence.

The Plan also argues it was proper to rely on Dr. Santos's IME over Dr. Comer's 1998 opinion. Dr. Comer was Plaintiff's treating rheumatologist. In 1998, Dr. Comer completed an assessment of Plaintiff's ability to do work-related activities. AR 0191. Dr. Comer opined Plaintiff was limited for frequent lifting to two pounds, with an absolute limit of ten pounds, standing/walking was limited to one hour total, and twenty minutes without interruption, during a typical eight hour workday, and sitting was limited at four hours total or one hour without interruption, with frequent change of position. AR 0191. Dr. Comer further opined that Plaintiff should never perform postural activities requiring her to climb, stoop, crouch, kneel, or crawl. Dr. Comer also limited Plaintiff in regards to repetitive activities, i.e., activities involving reaching, handling, and pushing/pulling.

The Plan is correct that it was not required to give greater weight to the opinion of Plaintiff's treating physician. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)(holding that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."). The concern here is how the Plan had no problem relying on a 1997 FCE to support its finding that Plaintiff is no longer disabled and thus not

entitled to benefits, yet it disregarded Dr. Comer's 1998 assessment of Plaintiff's ability to do work-related activities which supports disability as "eight years stale."  Def.'s Resp. at 8.

Based on all these factors, the Court finds that the Plan's third party administrator's decision to terminate Plaintiff's long term disability benefits on the grounds that she purportedly was able to perform "any occupation" was arbitrary and capricious, and its decision was not supported by substantial evidence.

## IV.  Remedy

Having concluded that the Plan's third party administrator's decision was arbitrary and capricious, the Court must determine the proper remedy.  ERISA provides the Court discretion in identifying "appropriate equitable relief" where the Court determines that the Plan's administrator acted arbitrarily or capriciously.  29 U.S. §1132(a)(3).  "[W]hen a reviewing court concludes that a plan administrator has acted arbitrarily and capriciously in handling a claim for benefits, it can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits."  *DeGrado v. Jefferson Pilot Financial Ins. Co.*, 451 F.3d 1161, 1175 (10th Cir. 2006)(internal quotations omitted).  The Court finds that retroactive reinstatement of benefits is appropriate under the facts of this case.  Accordingly, Plaintiff's long term disability benefits will be retroactively awarded from April 18, 2006 through the date of this Memorandum Opinion and Order.  The Plan may, of course, re-consider Plaintiff's ongoing eligibility for benefits under the "any occupation" standard in the future.

Additionally, Plaintiff seeks attorney's fees and costs associated with bringing this action.  The Court has discretion to award attorney's fees.  29 U.S.C. §1132(g)(1)("In any action

under this subchapter . . . by a participant, beneficiary, or fiduciary, the court in its discretion

may allow a reasonable attorney's fee and costs of action . . . .").  In order for the Court to

consider this issue properly, Plaintiff shall file a petition for prejudgment interest, attorney's fees

and costs, setting forth her arguments as to why she is entitled to the same.  The Plan will have

the opportunity to respond to Plaintiff's application.

      **NOW, THEREFORE,**

      **IT IS HEREBY ORDERED** that Plaintiff's Opening Brief to Overturn Administrator's

Decision is **GRANTED**, and **JUDGMENT** is entered in favor of Plaintiff.  Plaintiff's long term

disability benefits are retroactively awarded from April 19, 2006 through the date of this

Memorandum Opinion and Order.

      **IT IS FURTHER ORDERED** that Plaintiff's Motion to Supplement the Record and

Supporting Memorandum is **DENIED.**

      **IT IS FURTHER ORDERED** that Defendant's Motion and Memorandum in Support of

Judgment on the ERISA Administrative Record is **DENIED.**

      **Dated** this 30th  day of March, 2009.


                                 _____
                              **MARTHA VAZQUEZ**
                              **CHIEF UNITED STATES DISTRICT JUDGE**


**Attorney for Plaintiff:**
Charles R. Finley

**Attorneys for Defendants:**
Danny W. Jarrett